91 N.Y.2d 306 (1997)
693 N.E.2d 724
670 N.Y.S.2d 377
In the Matter of Sayeh R. and Another, Children Alleged to be Neglected. Monroe County Department of Social Services, Appellant; Patricia Ann P., Respondent.
Court of Appeals of the State of New York.
Argued October 15, 1997
Decided December 22, 1997.
Charles S. Turner, County Attorney of Monroe County, Rochester (Ronald A. Case of counsel), for appellant.
Harris Beach & Wilcox, L. L. P., Rochester (David C. Boysen and Laura J. Wilson of counsel), for respondent.
Dennis C. Vacco, Attorney-General, Albany (Barbara G. Billet, John W. McConnell and Marlene O. Tuczinski of counsel), for State of New York, amicus curiae.
Chief Judge KAYE and Judges TITONE and LEVINE concur with Judge CIPARICK; Judge SMITH dissents and votes to affirm in a separate opinion in which Judges BELLACOSA and WESLEY concur; Judge BELLACOSA dissents in another opinion in which Judges SMITH and WESLEY also concur.
*310 CIPARICK, J.
In this extraordinary case, a Family Court Act article 10 child protective proceeding, petitioner Monroe County Department of Social Services (DSS) alleges that respondent Patricia Ann P., a Florida resident, has neglected her two children by her failure and inability to provide a minimum degree of care causing impairment of their emotional health and well-being and a substantial risk of serious future harm. The children, Sayeh (now 18)[1] and Arash (now 14), have, for the past 8½ years, been living with their father, in Rochester, New York.
*311 The issues presented are (1) whether the Federal Parental Kidnaping Prevention Act (PKPA) (28 USC § 1738A) preempts the Family Court from taking any action in this case under article 10 of the Family Court Act; (2) whether there is support for allegations that respondent has engaged in acts or omissions constituting neglect within the meaning of section 1012 of the Family Court Act which would justify petitioner's exercise of its child protective responsibility; and (3) whether acts by respondent authorize the assertion of personal jurisdiction by Family Court of the State of New York. We hold that Family Court does have subject-matter jurisdiction over this proceeding and may properly assert personal jurisdiction over respondent. The matter was improperly dismissed on jurisdictional grounds, without reaching the merits, and accordingly should be remitted to Family Court for further proceedings.

I. FACTS AND PROCEDURAL BACKGROUND
Ahmad R. and Patricia Ann P. were married in Florida in December 1980. Three children were born of the union, Sayeh in October 1979, Sara in October 1981, and Arash in July 1983. A judgment of divorce was granted by the Florida Circuit Court in January 1986, with respondent designated the primary custodial parent. The father relocated to Rochester. In September 1988, Raymond Wike, described in the record as a former boyfriend or acquaintance of respondent, abducted Sayeh and Sara from their bedroom while respondent slept. Wike attacked the two girls, raping and repeatedly stabbing them. Sara was murdered, and Sayeh survived only by feigning death.
In 1989, the Florida court modified its 1986 custody order by making the father the primary custodial parent. Respondent was granted liberal summer and Christmas visitation rights. In so doing, the Florida court stressed the children's need for counseling in the wake of their sister's murder and its finding that the father was the "most capable of providing the daily needs as well as the extraordinary psychological needs of the children" (emphasis supplied). Pursuant to that order, Sayeh and Arash were relocated to Rochester to live with their father, stepmother and children from the second marriage.
For all of the more than eight years since then until the present time, Sayeh and Arash have been New York domiciliaries. *312 Over the years, their lives appear to have become completely integrated into their new family unit in Rochester where they have enjoyed the love, guidance and emotional support of their family on a daily basis.
In contrast with the safe and nurturing environment which the children apparently have enjoyed in their Rochester home, there are corroborated allegations that respondent repeatedly verbally and physically abused the children during their visits to Florida.
In 1995, the children expressed their unwillingness to visit their mother in Florida, indicating that they no longer wished to see her. In December of that year, respondent traveled to Rochester to attempt to enforce her rights to visitation through temporary custody of the children in Florida over their Christmas vacation. Respondent went to the children's home accompanied by a police officer and also allegedly by an unidentified male companion, but was rebuffed and informed that the children did not want to see her.
Respondent then sought enforcement of her visitation rights by means of contempt proceedings against her former husband in the Florida court. In March 1997, following repeated contempt orders against him resulting from a refusal to deliver the children to Florida, the Florida court modified its 1989 custody order, granting primary custody to respondent. An unsuccessful attempt was made in New York to modify the Florida court order which respondent aggressively defended, seeking, affirmatively by order to show cause and subsequently filed attorney's affidavit, enforcement of her rights as per the Florida orders to temporary and then permanent custody (see, Matter of Mott v Patricia Ann R., 91 N.Y.2d 856 [decided today]).
In April 1997, petitioner DSS filed the instant petition in Family Court, alleging that, as a result of the prior trauma, the children have weakened psychological functioning and diagnosed serious psychological and emotional pathologies, which would be further severely aggravated by respondent's efforts to obtain temporary and permanent custody.
Respondent moved to dismiss the petition and after a hearing on the issue of jurisdiction, Family Court granted her motion. The court held that (1) it lacked personal jurisdiction over respondent, insomuch as the acts alleged by DSS, even if established, did not constitute neglect within New York necessary to support personal jurisdiction under Family Court Act § 1036 (c); (2) the emergency jurisdiction provisions of the *313 Uniform Child Custody Jurisdiction Act (UCCJA) (Domestic Relations Law article 5-a) were inapplicable; and (3) the Federal PKPA precluded the court from modifying the Florida court's custody determination.
Reaching only the issue of personal jurisdiction, the Appellate Division affirmed. The Court reasoned that, by arguing that "the emotional consequences in New York of respondent's attempt to enforce otherwise valid Florida orders of visitation and custody constitute neglect occurring within New York," petitioner in effect sought a
"holding that a valid visitation and custody order of one State is the basis for a neglect finding in another State. * * * Such a holding would contravene the strong public policy embodied in the [UCCJA] and [PKPA] to avoid conflicting determinations in interstate custody disputes and would encourage conversion of private custody disputes into child protective proceedings." (239 AD2d 959, 960.)
We granted leave to appeal and now reverse and remit to Family Court for further proceedings.

II. ANALYSIS
A. PKPA Preemption
Although Florida has chosen to retain jurisdiction over any custody matters involving respondent mother and the father of the children, the instant proceeding is not an attempt to modify the foreign custody determination but, rather, a valid exercise of lawful authority by an independent statutorily created governmental agency to intervene on behalf of two New York children at risk. In its role as parens patriae, New York is under a powerful duty to protect its domiciliaries from harm (see, e.g., NY Const, art XVII, § 3). Clearly in the context of a child protective proceeding, the State of New York is best placed to carry out this most important duty in protecting its own infant residents.
A child protective proceeding under article 10 is specifically designed to protect children from injury, abuse or mistreatment, and to help safeguard their physical, mental and emotional well-being (see, Family Ct Act § 1011). Thus, because the parties involved and the relief sought in this child protective proceeding are quite distinct from those of a custody dispute, this child protective proceeding is not a "custody determination" within the meaning of the PKPA or New York's UCCJA (see, L.G. v People, 890 P2d 647 [Colo]; In re Interest of L. W., 241 Neb 84, 486 NW2d 486; State ex rel. Department of Human Servs. v Avinger, 104 NM 255, 720 P2d 290; *314 see also, White v Blake, 859 SW2d 551 [Tex App]; cf., Matter of Mott v Patricia Ann R., 91 N.Y.2d 856, supra). We further note New York UCCJA's express exclusion of child protective proceedings from its definition of "custody proceeding" (see, Domestic Relations Law § 75-c [3]).
Here, DSS is acting independently pursuant to its statutory mandate, having investigated reports of alleged abuse and mistreatment. There is absolutely no evidence that DSS is acting on behalf of the children's father. On the contrary, there is independent clinical corroboration of the harmful effects Sayeh and Arash would suffer if removed from their home. Furthermore, New York State has a compelling interest in assuring the safety and well-being of its domiciliaries. As such, we conclude that Family Court erred in viewing this article 10 proceeding as an attempt to modify the Florida court's custody determination as between the parents, notwithstanding that court's retention of continuing jurisdiction over its prior custody order.
B. Authority of Monroe County DSS to Bring This Child Protective Proceeding
Respondent challenges the authority of DSS to bring this proceeding on the grounds that, as a matter of law, a parent's use of the New York courts and law enforcement authorities to enforce judicially granted rights of temporary or permanent custody cannot constitute neglect within the State (see, Family Ct Act § 1036 [c]). We disagree. While it is true that respondent has a legal right to seek enforcement of valid court orders, her disregard of her children's special vulnerabilities in attempting to enforce her rights of temporary or permanent custody could nevertheless give rise to a finding of neglect within the meaning of the Family Court Act.
As defined in the Family Court Act,
"`Impairment of emotional health' and `impairment of mental or emotional condition' includes a state of substantially diminished psychological or intellectual functioning * * * [and] must be clearly attributable to the unwillingness * * * of the respondent to exercise a minimum degree of care toward the child" (Family Ct Act § 1012 [h] [emphasis supplied]; see also, Family Ct Act § 1012 [f] [i] [defining a neglected child as one whose "physical, mental or emotional condition has been impaired *315 or is in imminent danger of becoming impaired as a result of the failure of (a) parent * * * to exercise a minimum degree of care" (emphasis supplied)]).
It is settled law that a child's frailties, weaknesses and special needs must be taken into account when they exist. Thus, the "minimum standard or degree of care" must, of necessity, take into account the special vulnerabilities of the child. For a child with such special vulnerabilities, the minimum standard of care will of necessity be an expansive standard (see, Matter of Milland, 146 Misc 2d 1, 6; see also, Matter of Hofbauer, 47 N.Y.2d 648 ["minimum degree of care" cannot be judged in a vacuum free from external influences, but rather each case must be decided on its own particular facts]; Matter of Jose Y., 177 AD2d 580; Matter of New York City Dept. of Social Servs. [Anna Marie A.] v Elena A., 194 AD2d 608). A parent fails to exercise a minimum degree of care in not responding to the special needs of a child, even when those needs may not seriously implicate general physical health (see, Matter of Sampson, 37 AD2d 668, 669, affd 29 N.Y.2d 900; Matter of Ray, 95 Misc 2d 1026, 1029). Parents may not ignore the fact that their conduct is impairing their children's emotional health (see, Matter of Theresa CC., 178 AD2d 687, 688-689).
Similarly, other State high courts have recognized that the "minimum degree of care" must take into consideration the special vulnerabilities of the child in question (see, e.g., In Interest of L.J., 436 NW2d 558, 561 [ND] ["It can hardly be questioned that some children require more care and attention and skill * * * than do others. The requisite care and control called for by a minimum standard of parenting must necessarily fluctuate with the kind of children being parented. There is no absolute standard"]; People in Interest of D.K., 245 NW2d 644 [SD]; see also, Matter of Scott G., 124 AD2d 928 [definition of neglect sufficiently elastic to embrace situations in which a parent allows the child to become impaired]).
In the instant case, we find it significant that an independent mental health expert, a child psychologist retained by DSS and not affiliated with either parent, after examining Sayeh and Arash, diagnosed them as suffering from clinical disorders stemming from their earlier trauma and predicted that their mental health might be worsened if respondent succeeded in immediately enforcing her visitation and custodial rights.
Specifically, with regard to Sayeh, the child psychologist found that:

*316 "nothing [could] be more terrifying and traumatic for Sayeh tha[n] to return her to the place where her sister was raped and murdered and where she was raped, physically assaulted and left for dead."
His prognosis on the effect of the success of respondent's efforts was:
"A major depression would probably be one component of her condition if this occurs. * * * This further suggests that if she experiences a personality disorganization as a result of being confronted with overwhelming life stress, that the disorganization would be massive."
Similarly, with respect to Arash, the psychologist found that:
"Arash also appears to have more anger than has been previously evident, with that anger serving to mask his fear of his mother and her potential actions. * * * These kinds of feelings [can] provide the psychological base for emotional trauma."
As respondent's efforts for temporary or permanent custody in Florida intensified, he wrote: "[Arash] is now more * * * disturbed * * * [T]he consequences are even more grave."
The independent child psychologist's clinical prediction of the effects that enforcement of respondent's visitation and custodial rights would have on the children cannot be ignored. It supports the allegation that, given these exceptional circumstances and special vulnerabilities, the children would be in imminent danger of severe emotional harm as a result of the mother's attempt to force their precipitous return to Florida without benefit of any preliminary ameliorative services (see, Matter of Milland, supra; see also, In Interest of L.J., supra). Surely, there is evidence to support a claim that respondent's conduct threatens to induce a "state of substantially diminished psychological * * * functioning" in the children (Family Ct Act § 1012 [h]). There is also evidence to support the allegation that the threatened "impairment of emotional health" (id.) would be "clearly attributable to the unwillingness" (id. [emphasis supplied]) of respondent to recognize and take into account the special vulnerabilities of her children.
Critical is the fact, uncontested in this record, that the children's special vulnerabilities resulted from the unique, devastating trauma they experienced earlier while in their mother's care, and that custody was then transferred upon an *317 assessment of her incapability to provide adequate care for these especially needy children. In this situation, where enforcement of respondent's judicially granted rights to temporary or permanent custody would, in the sound judgment of qualified independently and otherwise retained clinicians, cause severe emotional harm, our child protective laws are not impotent to protect these children through the invocation of an article 10 proceeding.
We note also that although respondent unquestionably had a legal right to seek to enforce her Florida visitation rights, she had an obligation to pursue those rights in a responsible way. Given the family's history, a responsible adult would have considered the possibility that an abrupt resumption of visitation with respondent in Florida  and a forced return to the place where the harrowing trauma-producing events occurred  might have a devastating effect on the children's psychological well-being. Yet, respondent chose to insist upon just such a sudden shift of temporary custody instead of taking a gradual approach by initially seeking short, supervised visits, coupled with family counseling for all of the principals, as a means of building a positive relationship and restoring the children's trust to whatever extent was possible. Undoubtedly, had respondent chosen such a gradual course, New York courts and social services agencies would have been willing to provide the necessary support and facilities. Respondent's contrary decision to demand an immediate delivery of the children without regard to their need for preparatory counseling and related services could well be found to represent precisely the kind of failure "to exercise a minimum degree of care" that our neglect statute contemplates (see, Family Ct Act § 1012 [f] [i]).
Thus, contrary to the dissenters' suggestion that this is merely a case about respondent seeking contact by way of visitation with her children in an environment secure to the children, the instant determination that the allegations of neglect are valid would be predicated more accurately upon respondent's heedless and precipitous efforts to enforce visitation rights in Florida and, when she was unsuccessful, threatening the children with the ultimate sanction of forced immediate relocation to Florida in her sole custody.[2]
*318 Surely, on the basis of the potential harm clinically identified in this record, it cannot be said here that the allegations of neglect are insubstantial or that the exercise of child protective jurisdiction is merely a parental device to overturn a custody determination validly made by a court of another State, and we are confident that the New York courts and child protective agencies will be vigilant against any such abuse of our protective laws in the future. In the latter regard, it is especially significant that the Family Court Act does not permit the initiation of article 10 proceedings by anyone other than a child protective agency, except with prior court authorization (see, Family Ct Act § 1032; see also, Family Ct Act § 1012 [i]; Matter of Weber v Stony Brook Hosp., 60 N.Y.2d 208, 212, cert denied 464 US 1026).
C. Personal Jurisdiction
Although the courts below sustained the dismissal of the instant petition on the grounds of lack of personal jurisdiction, we disagree and hold that the instant allegations are sufficient to satisfy the requirements of Family Court Act § 1036 (c). That section provides, in pertinent part,
"In cases involving either abuse or neglect, the court may send process without the state in the same manner and with the same effect as process sent within the state in the exercise of personal jurisdiction over any person subject to the jurisdiction of the court under [CPLR 301 or 302], notwithstanding that such person is not a resident or domiciliary of the state, where the allegedly abused or neglected child resides or is domiciled within the state and the alleged abuse or neglect occurred within the state" (Family Ct Act § 1036 [c] [emphasis supplied]).
It is undisputed that Sayeh and Arash are New York domiciliaries and, as noted above, petitioner has sufficiently supported its allegations that the acts of neglect occurred within the State.
Notably, here, this conduct (that is, acts in New York threatening the children with successful enforcement of her right to custody over them in Florida) brings respondent within the reach of New York's long-arm statute. Moreover, there is sufficient evidence that respondent has "`engaged in some purposeful activity [here] * * * in connection with the matter in suit'" (Parke-Bernet Galleries v Franklyn, 26 N.Y.2d 13, 16 [quoting Longines-Wittnauer Watch Co. v Barnes & Reinecke, 15 N.Y.2d 443, 457]; *319 see also, McGee v International Life Ins. Co., 355 US 220, 223). Use of the New York courts is a traditional justification for the exercise of personal jurisdiction over a nonresident (see, Rios v Altamont Farms, 64 N.Y.2d 792, 794; Lynch v Austin, 96 AD2d 196).
Respondent has repeatedly invoked the aid and protection of our courts, seeking affirmative relief here in New York in cross-moving, by order to show cause dated July 3, 1996, and subsequently in an attorney's affidavit of July 19, 1996, to enforce the Florida court orders in the related case of Matter of Mott v Patricia Ann R. (supra). Additionally, when respondent attempted to enforce visitation with the children in 1995, she enlisted the aid of local police. Based on the foregoing, respondent availed herself not only of the benefits of this State's courts but also of the support of this State's law enforcement system. Thus, the conclusion is inescapable that, under these particular circumstances, respondent deliberately and affirmatively sought the protection of this State's laws, and thereby rendered herself amenable to our general long-arm jurisdiction (see, Kazlow & Kazlow v Goodman & Co., 92 Misc 2d 1084, 1086; see also, Kreutter v McFadden Oil Corp., 71 N.Y.2d 460, 466-467; Burger King Corp. v Rudzewicz, 471 US 462, 477).
Accordingly, the order of the Appellate Division should be reversed, without costs, and the matter remitted to Family Court for further proceedings in accordance with this opinion.
SMITH, J. (dissenting).
The majority holds that when one parent illegally prevents the other parent from visiting their children, the efforts to effectuate visitation pursuant to a court order by the excluded parent may constitute "neglect." Because the reasoning of the majority may not be sustained, we dissent.
This neglect proceeding was brought by the New York Monroe County Department of Social Services (MCDSS) for an order of protection to prevent the subject children from having to comply with a custody order issued by a court in Florida. Prior to the commencement of this matter, the father, a New York resident, had prevented his ex-wife from visiting and communicating with their children. His actions were in violation of court orders issued by a Florida court which had explicitly granted the mother such parental rights.
*320 The majority inconsistently holds that the mother had "a legal right to seek enforcement of valid court orders" but doing so would fall below a "minimum standard or degree of care" due to the "special vulnerabilities" of her children (majority opn, at 315). Seeming to ignore the fact that it was the father's extralegal actions which forced the mother to turn to the courts in the first place, the majority holds that the mother did not have the legal right to exercise the legal rights she had. We disagree with the instant rationalization of the majority and conclude that the mother's actions do not constitute child "neglect" occurring in this State to extend personal jurisdiction over her.
Moreover, the courts of Florida continue to exercise original jurisdiction over this matter in the best interests of the children. Under such circumstances, principles of comity and public policy virtually preclude a New York court from granting the relief sought by petitioner to modify an order of the Florida court in any event (see, Matter of Mott v Patricia Ann R., 91 N.Y.2d 856 [decided today]). Accordingly, we dissent from the majority and would affirm the order of the Appellate Division.
While it is unnecessary to address all of the facts and allegations in this case as outlined by the majority, a few points should be noted for clarity. Following the tragic incident which culminated in the death of one daughter in September 1988, the father commenced a proceeding in Florida to modify the existing custody order encompassed by the original divorce decree. By order of the Florida court dated June 7, 1989, the father obtained custody of the surviving daughter and the son who moved to New York to live with their father. The mother was awarded liberal visitation rights and custodial periods in Florida which included summer and Christmas holiday vacations.[1]
Although the father was awarded custody and charged with oversight of the "extraordinary psychological needs of the children," counseling for the daughter was discontinued in 1992 and for the son in 1993 upon the father's "contention that it was no longer needed." Then, without initiating further proceedings regarding custody of the children, the father simply prevented their mother from seeing them. In 1994, the father refused to send the children to Florida during the Christmas holidays despite a previous agreement to do so. *321 However, plans were made for the mother to spend the holidays with her children in New York. Thereafter, the father refused to allow the mother to speak with the children when she telephoned and threatened her with harassment charges if she or any of her family or friends tried to contact the children. When he refused to permit a Christmas visit in 1995, the mother arrived in New York to visit her children accompanied by a police officer and another man. However, the children refused to leave with their mother.
Seeing no alternative, the mother filed contempt motions in the Florida court against the father's illegal efforts to block visitation. In each instance, the court found the father in willful contempt of previous court orders and ordered visitation and further counseling for all parties. The father took no steps to comply with any of these court orders. Nor did he bring any legal action in Florida seeking a modification of the mother's visitation rights or appeal the contempt orders entered against him in Florida.[2]
Following the father's third citation for willful contempt in Florida, the mother filed a petition to modify the custody order. The children were represented in the Florida proceeding by a Florida guardian ad litem who spoke with them and their psychologists in New York. The report of the Florida guardian ad litem recommended that it was "in the best interest of the children that they should remain in the primary care of their father." Despite that recommendation, the Florida court ordered the mother to become the primary residential parent for the children subject to "frequent and liberal access with their father" commencing 72 hours after the end of the children's last school day in New York, but not later than June 15, 1997.
The court noted that all of the psychological reports had recognized that the children's relationship with their mother was an important element of the maturation and healing process. Moreover, the reports noted that the children's feelings *322 toward their mother should be addressed, preferably in counseling. However, the court clearly believed that the counseling recommendations were unlikely to occur if the father retained custody. As the court stated:
"this Court has attempted to exhaustion to secure compliance by the father with efforts to resolve this case short of a change of custody. The Court concludes there is no evidence in the record demonstrating the father will cooperate with the guardian's recommendations; whereas, the record is filled with evidence of the father's outright refusal to co-operate in any way with the Court's orders."
The father continued his pattern of ignoring the Florida courts and never appealed the order. However, after the Florida order was issued, the children's "current psychological status" was reevaluated by a counselor, in part, at the request of the father.[3] Supported by the new evaluation, the MCDSS filed the instant neglect proceeding. The petition alleged that if the children were returned to the custody of the mother, their emotional and physical well-being would be at risk.
Family Court dismissed the instant proceeding for want of jurisdiction and the Appellate Division affirmed. The majority finds that the order of the Appellate Division should be reversed. We dissent.

A

Long-Arm Jurisdiction Under the Family Court Act
This Court must find that the petitioner's allegations of neglect occurred in this State to assert personal jurisdiction over the nonresident mother. It is only upon a loose and newly expanded interpretation of "neglect" that the majority is able to find such jurisdiction and entertain the instant proceeding. Furthermore, the majority's heretofore unrealized finding of "purposeful activity" runs afoul of constitutional due process.
Prior to 1990, the Family Court Act contained no provision to allow service upon an out-of-State respondent parent in child abuse and neglect proceedings. The absence of such statutory authority compelled courts to dismiss such actions involving *323 nonresident parents (see, e.g., Matter of Commissioner of Social Servs. v Harry R., 145 Misc 2d 768). However, in 1990, section 1036 of the Family Court Act was amended to authorize out-of-State service of a summons in child protective proceedings in cases involving abuse or neglect. As stated by the bill's sponsor, the amendment would permit a court in such proceedings "to send process without the State pursuant to the long arm jurisdiction provisions of the CPLR where the allegedly abused or neglected child resides within the state" (see, Senator Goodhue, letter to Honorable Evan Davis, June 14, 1990, Bill Jacket, L 1990, ch 268). A year later, in 1991, the statute was again amended to provide long-arm jurisdiction if the child either resides or is domiciled in New York and the subject abuse or neglect occurs in the State. The proponents of the amendment universally felt that the new requirement that the abuse or neglect occur in New York was constitutionally mandated.[4]
As currently stated in Family Court Act § 1036 (c):
"In cases involving either abuse or neglect, the court may send process without the state in the same manner and with the same effect as process sent within the state in the exercise of personal jurisdiction over any person subject to the jurisdiction of the court under section three hundred one or three hundred two of the civil practice law and rules, notwithstanding that such person is not a resident or domiciliary of the state, where the allegedly abused or neglected child resides or is domiciled within the state and the alleged abuse or neglect occurred within the state."
Consistent with the requirements of due process, the jurisdictional standards under article 10 of the Family Court Act are not mere technicalities to be dispensed with because children are involved. Since the basis of the proceeding arises from the respondent's in-State abuse or neglect of the child, personal jurisdiction under the Family Court Act is consistent *324 with the general long-arm provisions of the CPLR. The location of the children is not dispositive. It is also the perpetration of instances of neglect or abuse within New York which provides sufficient "minimum contacts" with this State by a nonresident to allow the assertion of personal jurisdiction over him or her.

B

Neglect Occurring in New York
Since it is undisputed that the children are domiciled in New York, the sole question before this Court concerns the locus requirement that the neglect occur in New York to assert personal jurisdiction over the mother.[5] The majority erroneously divides this inquiry into a two-step process. First, the majority finds that the mother's efforts to gain custody of her children through the Florida court may constitute "neglect" due to her disregard for her children's "special vulnerabilities." Second, rather than examine whether such "neglect" occurred in New York to satisfy the long-arm jurisdictional requirements of the Family Court Act, the majority finds that jurisdiction may be obtained over the mother based upon two separate events: (1) the mother's efforts to defend and enforce her court ordered rights of parental visitation in litigation brought against her in New York; and (2) the enlistment of a New York police officer to help enforce the same rights. Contrary to the reasoning of the majority, these events, taken individually or together, are insufficient evidence of neglect occurring in New York to justify the assertion of personal jurisdiction over the mother.
It should be noted that the instance where the mother was involved in litigation to defend her parental rights was not included in the petition  nor was it cited to Family Court during oral argument  as an allegation of neglect. In fact, the petition makes no reference at all to the mother's efforts to defend or enforce her parental rights through the courts of Florida or New York.
The mother's defensive litigation efforts in New York do not justify long-arm jurisdiction. Although the majority states that *325 the "[u]se of the New York courts is a traditional justification for the exercise of personal jurisdiction over a nonresident" (majority opn, at 319) such reasoning has heretofore only been applicable to the "initiation and prosecution" of New York claims (Kazlow & Kazlow v Goodman & Co., 92 Misc 2d 1084, 1085) and not in the context of defensive litigation efforts based upon an absence of jurisdictional elements. Notably, we have unanimously affirmed the dismissal of the prior action for lack of jurisdiction (Matter of Mott v Patricia Ann R., 91 N.Y.2d 856, supra).
Most troubling is the majority's conclusion that the mother's efforts to defend her parental rights through the court system of New York qualifies as "neglect" occurring in this State. Apparently, the only option available to the mother was to sit back and do nothing in the prior proceeding. It is by defending her parental rights that she "neglected" her children which, in turn, provides the basis for a subsequent protective proceeding and sufficient minimum contacts to establish personal jurisdiction in that proceeding.
Contrary to the majority's assertion, the record is barren of evidence that the mother ever "threaten[ed] the children with the ultimate sanction of forced immediate relocation to Florida in her sole custody." (Majority opn, at 317.) Rather, it is the ruling of the Florida court requiring the children's relocation to Florida which has caused the alleged "neglect" of the children as manifested by their apprehension of relocating. Moreover, under no reasoning may the mother be said to have disregarded counseling recommendations to the detriment of her children by defending rights in a New York proceeding which occurred prior to the issuance of such recommendations. The majority opines that a "responsible adult" would have ignored her visitation rights, allowed her ex-husband to impede her efforts at building a relationship with her children and, instead, would have taken a "gradual approach by initially seeking, short, supervised visits, coupled with family counseling for all of the principals" (majority opn, at 317). The majority seemingly forgets that each time the Florida court cited the father for contempt, the court ordered just such counseling and visitation which the father repeatedly disregarded. Simply, there is no support for the majority's conclusion that the mother's defensive litigation may constitute an act of neglect occurring in this State.
It is difficult to fathom how a mother's efforts to legally protect her parental rights by going to court could ever constitute *326 neglect. Rather, the mother's legal and ordinarily permissible attempts to enforce court orders and defend her parental rights are the antithesis of "neglect" and clearly represent a "minimum degree of care." The majority's ruling means that every action involving children (e.g., divorce) may provide a basis for a subsequent protective proceeding solely because the litigation itself was an example of neglect. The majority understandably seeks to limit its holding to cases involving children with "special vulnerabilities" which might restrict parental behavior which would otherwise be "unquestionably" lawful (majority opn, at 316, 317). In such cases, the majority holds that a parent does not have the legal right to exercise the legal rights he or she has. Such reasoning is unsupportable here where the mother had no other legal recourse in the face of her ex-husband's illegal actions.
The sole allegation of neglect contained in the petition which actually occurred in New York concerns the mother's visit in December 1995. The mother was legally entitled to the visit and the fact that she was accompanied by a police officer due to her husband's threats to have her arrested if she attempted to see her children does not constitute "purposeful activity" directed at this State. Indeed, as advocated by the majority, such a familial visit in the children's primary home setting is precisely the type of "gradual course" that a "responsible" parent would have pursued to reestablish visitation  which had been extralegally impeded in the first instance. The record lacks any evidence that the mother disregarded her children's well-being by attempting the visit or that she had any notice that the visit would harm her children. This single allegation is certainly insufficient to sustain the majority's unprecedented ruling in derogation of constitutional due process.

C

This Court Should Not Exercise Jurisdiction Under Established Principles of Comity and Public Policy
Although the lack of personal jurisdiction is, by itself, a sufficient reason to dismiss this proceeding, there are several other compelling reasons why the majority's ruling is untenable. The Parental Kidnaping Prevention Act (PKPA) "imposes a duty on the States to enforce a child custody determination entered by a court of a sister State if the determination is consistent with the provisions of the Act" (Thompson v Thompson, 484 US 174, 175-176). The PKPA is applicable to "custody *327 determinations" which are broadly defined as "a judgment, decree, or other order of a court providing for the custody or visitation of a child, and includes permanent and temporary orders, and initial orders and modifications" (28 USC § 1738A [b] [3]). Despite the unqualified language of the PKPA, the majority concludes that the provision does not apply to protective proceedings brought by the State.[6]
However, to the extent that they seek to review the Florida court's custody determination, the courts of New York are without subject-matter jurisdiction to do so (see, Matter of Mott v Patricia Ann R., 91 N.Y.2d 856, supra). The MCDSS filed this proceeding seeking to prevent the mother from enforcing the Florida custody order. It will certainly be difficult to grant any relief to petitioner without somehow modifying the Florida court's custody determination or otherwise rendering it unenforceable. Under any rationalization, the MCDSS explicitly sought to modify an "order of a court providing for the custody or visitation of a child" (28 USC § 1738A [b] [3]) which falls directly within the purview of the PKPA. Indeed, in oral argument before this Court, counsel for MCDSS stated that it was seeking "an order to place the children in a safe and secure setting." Not even the majority endorses the possibility that the lower court may issue an order awarding primary custody to the father upon remittal.
Notably, basic principles of comity are concerned with the welfare of children as well as the restraint of abuses to the judicial process (see, Martin v Martin, 45 N.Y.2d 739, 741; see also, Domestic Relations Law § 75-b). The fact that "the children's best interest must come first * * * does not mean that the courts of this State should disregard [a] prior Florida judgment and determine, as if writing on a clean slate, who would make a better parent" (Martin v Martin, supra, 45 NY2d, at 741). Here, the Florida court has shown a willingness to enforce its own orders and it seems unlikely that that court will simply allow the father to ignore its orders with impunity. *328 Pitting the courts of two jurisdictions against each other is at odds with the desire to decrease litigation that is allegedly already harming the children.
In this case, the father's self-help efforts have thwarted the mother's legal visitation rights. This is precisely the type of behavior that we have declined to sanction in the past (see, e.g., Matter of Berlin v Berlin, 21 N.Y.2d 371, 377; Martin v Martin, supra, 45 NY2d, at 742 ["successive contradictory determinations by courts of sister States, even if with `jurisdiction', are unseemly and intolerable in a Federal union"]). It should also be noted that the father obtained custody by commencing a proceeding in Florida to modify the original custody award encompassed by the divorce decree and there is nothing preventing the father from taking such steps now. Indeed, his failure to do so is wholly unexplained.
The psychological evaluation upon which petitioner primarily relies is dated subsequent to the trial court ruling in Florida. Indeed, the focus of the report is the emotional impact of the Florida order upon the children. Such evidence could be referred to the Florida court for a determination of whether a further custody modification would be in the best interests of the children. The Florida court is also better situated to impose any familial or parental counseling on the mother or even modify the terms of her visitation rights should it be found necessary.[7]
The precedent issued today jeopardizes the power of all parents  indeed, all nonresident litigants  to legally defend their rights against illegal obstacles erected by another parent or other party. Moreover, principles of logic, comity and public policy fully support the conclusion that the courts of New York *329 should properly refrain from adjudicating issues relating to the mother's custody and visitation rights. This is not a case of which court should decide such issues; rather, the majority opens the door to the possibility that a New York court might issue purportedly binding orders that directly contradict orders of the Florida courts  all without any basis for the assertion of personal jurisdiction over a Florida resident.
We note that the majority's ruling here cannot immunize or condone the father's continual actions which have been contrary to the court orders issued by the Florida courts. It is his duty to appeal to the courts in Florida regarding his illegal actions. We further note that the father's actions, and his potential civil or even criminal liability, are clearly not in the children's best interests. All of these issues should be examined to determine the best course of action in the best interests of these children.
There is no question that the subject children have endured much tragedy which has left an indelible imprint upon their emotional psyches. However, it is also clear that the mother and father share an acrimonious relationship which may be affecting their children in none too subtle ways. Recently, the Florida Court of Appeal, First District, reversed the court order which prompted this proceeding "insofar as it directly orders the children to comply with that order as well as all previous orders of the court" (see, Tomaso v Rivazfar, 701 So 2d 407, 408 [Nov. 10, 1997]). The father never appealed the remaining portion of the Florida custody order. Clearly, the courts of Florida are eminently qualified to protect these children and that State, if given the chance, will take any and all steps necessary to do so in its continued vigilance in this matter.
Accordingly, we dissent from the majority's ruling and conclude that the order of the Appellate Division should be affirmed.
BELLACOSA, J. (dissenting).
While I concur in the result urged in the dissenting opinion of Judge Smith, I write separately to stress my reasons for voting to affirm the Appellate Division order. This complementary dissenting expression also reflects reasons for joining the Court's unanimous affirmance in Matter of Mott v Patricia Ann R. (91 N.Y.2d 856 [decided today]).
Drawing on comity and public policy considerations, as well as constitutional and statutory principles, we dissenting Judges *330 are unable to discern a legally cognizable basis to justify the reversal of the Appellate Division order. Within the framework of the petition, record and authorities governing this case, New York should not interpose its adjudicative authority against the competence and efficacy of the Florida court that originally determined, and continues to possess and exert jurisdiction over this custody-visitation dispute (see, Domestic Relations Law § 75-o; Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 75-o, at 349-350; Fla Stat Annot §§ 61.1306, 61.1308, 61.1326; Yurgel v Yurgel, 572 So 2d 1327, 1330 [Fla]).
The PKPA and UCCJA, in conjunction with empirically developed standards designed for reasonable and fair adjudication of familial disputes and for inculcation of public respect for the judicial process, serve an overarching purpose  reasonably definitive noncompetitiveness among the State courts (see, 28 USC § 1738A [Parental Kidnaping Prevention Act]; Domestic Relations Law art 5-A [Uniform Child Custody Jurisdiction Act]; Thompson v Thompson, 484 US 174, 180, 183; Vanneck v Vanneck, 49 N.Y.2d 602, 608; Yurgel v Yurgel, supra, 572 So 2d, at 1330; Restatement [Second] of Conflict of Laws § 79, comment a). These efforts have been mutually agreed upon as disincentives to mitigate against children being used as pawns in contests that entangle litigants and courts amidst powerfully competing legal rights and values.
In Vanneck, for example, this Court explained:
"The UCCJA represents a considered effort to give stability to child custody decrees, minimize jurisdictional competition between sister States, promote co-operation and communication between the courts of different States, all to the end of resolving custody disputes in the best interests of the child" (Vanneck v Vanneck, supra, 49 NY2d, at 608 [citations omitted]).
The long-time Practice Commentator for the New York Domestic Relations Law amplifies in these words:
"[A]s long as the non-custodial parent or any other `contestant' as defined in Section 75-b * * * remains rooted in the original state, that state is entitled to the first crack at modification, and under the PKPA no other state's court may assume jurisdiction unless and until the original state has declined" (Sobie, Practice Commentaries, McKinney's Cons Laws *331 of NY, Book 14, Domestic Relations Law § 75-o, at 350).
The applicable statutes, guiding principles and prevailing policies should, therefore, persuade New York courts to forebear the assertion of jurisdiction generally and especially in this case on its objectively analyzed record.
We dissenting voices can appreciate an arguable framework for any State declaiming territorial superiority when horrific facts underlie and surround a terribly dysfunctional situation. On the other hand, emotionally driven circumstances are precisely the kind of subjective features that ought to light caution signals for courts of law invested with the obligation to apply objective legal principles, particularly to hard cases. We wish to underscore, however, that we share the felt human and judicial concern for the welfare and best interests of the children in this case and those who will be governed by its rule from now on.
Juridical discipline is always necessary, but particularly desirable when sympathetic facts interface with what may seem to be coldly analytical processes. Importantly, the role of the courts in implementing the various legislative mandates in these delicately balanced situations and in exercising their parens patriae supervision is principally to render fair and principled decisions to all concerned. That goal, through the instrumentality of the judicial process, provides some measure of definiteness, regularity and consistency, resting on a mutuality of respect for the integrity, competence, compassion and intelligence of sibling States' judicial systems and protocols, as well New York's. The Golden Rule, simple as it seems, offers universally useful instruction here because New Yorkers expect a reciprocal respect when the writs and residents of their State are placed in question or jeopardy elsewhere (see, In re Clausen, 442 Mich 648, 691, 502 NW2d 649, 668, stay denied sub nom. DeBoer v DeBoer, 509 US 1301; compare, Johnson v State, 511 So 2d 1333, 1343-1344 [Miss] [Robertson, J., dissenting], revd 486 US 578; see originating case, People v Johnson, 69 N.Y.2d 339).
Against this backdrop, the majority (1) tenders an exigent rationale, (2) declares a new standard of legal neglect dependent on a novel concept of "special vulnerabilities," and (3) promulgates a ground-breaking precedent. Together, these features decide this case with a New York jurisdictional outreach.
*332 The reasoning and rule inevitably contradict an inextricable ingredient of the Florida custody-visitation decree. In this respect, we dissenters perceive the direct effect of this case very differently from the majority, that elevates the father's custody component while devaluing the equally important mother's visitation rights. The practical consequence of today's ruling legitimatizes the father's functional severance of the mother-children's legal and actual relationship by continued suspension of all visitation and contact rights, obligations and efforts, pending more litigation here and in Florida.
In this significant case, the respondent mother's lawful conduct in attempting to communicate in New York with her children by phone, letter and visit, in accordance with the patently valid Florida court order, is now transformed by this Court's decree into a species of legally defined child neglect and psychological assault against her children. Ironically, failure to maintain the parent-child relationship with some contact would ordinarily serve as a basis for adjudging a parent neglectful of a child and might lead to a permanent severance and termination of parental rights (see, e.g., Family Ct Act § 614 [1] [d]).
Concededly, the respondent mother appropriately sought to enforce her visitation rights in accordance with the Florida court's specifications. Her rights were granted as part of the same Florida decree that gave custody to her former husband. Indeed, the father won his custodial rights from the Florida court and later violated the complementary visitation parts of that same decree. The record shows that he resorts to self-help to bypass licit judicial activity when it does not comport with his interests. He eventually abandoned fully pursuing his rights in the competent courts of Florida and turned instead to the New York courts, where he again lost. At that point, interest was aroused in the local child care agency in Rochester, New York, where the teenagers have resided with the father for many years. The Monroe County Social Services Department entered this family fray and undertook an official interventive responsibility on behalf of the teenagers' plight. While the agency's motives and objectivity are not in question, the timing and sequence of its white-knight actions through its special Family Court Act article 10 proceeding check or even checkmate the Florida custody-visitation decrees. The irony is that the father has managed even to juxtapose the judicial processes of two States against one another, while he gains the strategic upper hand in the continuing litigation activity, now *333 through the Rochester Social Services Department's lateral entry.
Thus, the decision that allows New York courts to assert adjudicative power over this matter in this fashion and on this legal theory and conflicted and frail record also directly confronts the purposes of wisely balanced and comprehensive jurisdictional-comity restraints. The protective perimeter is erected on foundation posts of mutual respect that is supposed to provide a bulwark against any State's or local agency's parochialism. Up to now, this has well served as a transcendent, special guardian of the best interests of all children, wherever they may be located (see, Thompson v Thompson, 484 US 174, 177; see also, In re Clausen, 442 Mich 648, 668-669, 502 NW2d 649, 657, stay denied sub nom. DeBoer v DeBoer, 509 US 1301, supra; Care & Protection of Vivian, 420 Mass 879, 884-885, 652 NE2d 616, 619; Note, One Child's Odyssey Through the Uniform Child Custody Jurisdiction and Parental Kidnaping Prevention Acts, 1993 Wis L Rev 589 [1993] [discussing effects on child in In Interest of A.E.H., 161 Wis 2d 277, 468 NW2d 190]).
For this Court today to countenance this New York party-and court-forum selection in these circumstances produces a disturbing result for the particular case. Of equal importance to the result, the litigation jockeying and the emanating rule should raise concerns about the unsettling paradigm established for countless other cases here, in other States and in all courts (see, Halvey v Halvey, 330 US 610).
The precedential consequences of cases decided on individualized exigency grounds were powerfully described by Justice Robert Jackson in 1944:
"All who observe the work of courts are familiar with what Judge Cardozo described as `the tendency of a principle to expand itself to the limit of its logic.' A military commander may overstep the bounds of constitutionality, and it is an incident. But if we [the United States Supreme Court, or I respectfully submit, the New York Court of Appeals] review and approve, that passing incident becomes the doctrine of the Constitution. There it has a generative power of its own, and all that it creates will be in its own image" (Korematsu v United States, 323 US 214, 246 [Jackson, J., dissenting] [emphasis added]).
*334 It is necessary also to make some reference to the role of the psychological material presented in the instant case. Experts, who predict future consequences based on their professional theories and examinations of subject children, should not be elevated to the singular importance of, in effect, overriding the array of pertinently balanced jurisdictional protections afforded to decrees affecting one of society's most sacrosanct relationships  parent and child. Courts must beware lest the unique juridical authority to decide these cases be sacrificed to the sheer crosswinds of paid or even so-called independent experts. The authority to decide cases in nondelegable and it invests particular competence of these most sensitive and complicated controversies in a given State with established priorities and precedence. Any competing State presuming to interfere with the force of first instance custody-visitation rulings by another State court or to alter its essential decree bears a huge threshold burden.
Pertinently, the conclusions asserted in the affidavits of the psychologists in this case  limited now to Arash, the only teenager still subject to this proceeding, despite the transfused emphasis placed by the majority on aspects pertaining to Sayeh  should not drive the outcome of this inter-State jurisdictional contest. Something more must be presented for New York to triumph, but that something is missing from this record as a matter of law; and no emergency is presented, a feature on which we all seem to agree. Indeed, Judge Smith's cogent articulation and analysis on all these aspects are compelling.
In sum, the majority's preference for New York courts over Florida's charts a new course for this latest litigation trip and many others yet to be encountered. The holding today significantly impairs the comity covenant among the States that ought to be the hallmark of custody determinations. Moreover, the ruling and its precedent may even impinge on and implicate the force of the Full Faith and Credit Clause (see, Matter of R.L.S., 879 P2d 1258, 1266 [Okla]; State in Interest of D.S.K., 792 P2d 118, 130 [Utah]; Care & Protection of Vivian, 420 Mass 879, 884-885, 652 NE2d 616, 619, supra; see also, Johnson v State, 511 So 2d 1333, 1343-1344, revd 486 US 578, supra; compare, People v Johnson, 69 N.Y.2d 339, supra). Finally, the practical consequences of the reversal of the order of the Appellate Division will fuel delay and multiplicity of overlapping and conflicting litigations, and will mar the harmonious face of comity.
Order reversed, etc.
NOTES
[1] Although Sayeh is now 18, Family Court is permitted to exercise jurisdiction over her regarding the alleged acts of neglect which occurred prior to her 18th birthday with her consent (see, Family Ct Act § 1055 [e]). Moreover, her brother's matter remains properly before this Court, and evidence of abuse or neglect as to the older sibling may be used in a child protective proceeding as to younger siblings still subject to the court's jurisdiction (see, Family Ct Act § 1046 [a] [i]).
[2] We do not condone any role the father may have played in thwarting visitation. This is not the proper forum for resolving factual differences regarding the conduct of either party. All we determine here are the law issues regarding preemption and jurisdiction.
[1] The children visited with their mother during the summer months and the Christmas holidays in 1990, 1991 and 1993.
[2] However, the children, by their guardian ad litem, filed a petition in New York which sought a temporary restraining order prohibiting them from being removed from this State and seeking to modify the Florida court's order by deleting the provisions which provided for the mother's visitation. We have affirmed the dismissal of that action for lack of jurisdiction (see, Matter of Mott v Patricia Ann R., 91 N.Y.2d 856, supra). The majority has noted that the mother defended her rights in that action by relying on the Florida court orders and, at the same time, moving for dismissal based upon lack of jurisdiction.
[3] The majority states that the "mental health expert" who examined the children was "not affiliated with either parent" (majority opn, at 315). However, his report explicitly states that his evaluation was conducted partially at the request of the father.
[4] See, Meservey, Acting Exec Director of Council on Children & Families, Mem to Moore, Apr. 26, 1991, Bill Jacket, L 1991, ch 69 ("the changes assure there is sufficient nexus between the exercise of personal jurisdiction and the acts giving rise to personal jurisdiction to make the statute more easily defensible against a constitutional challenge"); Perales, Dept of Social Servs, Apr. 26, 1991, Bill Jacket, L 1991, ch 69 ("the bill will ensure a constitutionally sound basis for obtaining jurisdiction over out-of-State respondents in child protective proceedings").
[5] As an initial matter, "neglect" only encompasses children under 18 years old. Since the daughter is now over 18, the mother's actions may not be considered "neglect" and the instant proceeding should be dismissed as to her. Indeed, petitioner concedes that the daughter is no longer subject to custody orders issued in either New York or Florida since she is over 18 years old (see, Domestic Relations Law § 2; Fla Stat Annot § 743.07 [1], [3]).
[6] Arguably, the preemption sphere of the PKPA is not so limited. Rather, the statute should be interpreted without qualification since it is clear that "Congress' chief aim in enacting the PKPA was to extend the requirements of the Full Faith and Credit Clause to custody determinations" (Thompson v Thompson, 484 US 174, 183, supra). As New York commentators have remarked, the PKPA "does not exclude child protective proceedings" (Sobie, 1997 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 75-c, 1997-1998 Pocket Part, at 95-96; see also, Care & Protection of Vivian, 420 Mass 879, 652 NE2d 616; State in Interest of D.S.K., 792 P2d 118 [Utah]; Matter of R.L.S., 879 P2d 1258 [Okla]).
[7] Importantly, New York State policy favors retention of parent-child relationships and contacts when acting in the child's best interests (Matter of Dickson v Lascaris, 53 N.Y.2d 204, 208). It should also be noted that the mother has a vital interest in retaining visitation with her children (see, Santosky v Kramer, 455 US 745, 753 ["Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life"]). Moreover, we have noted that a child's wishes may not be dispositive (see, Dintruff v McGreevy, 34 N.Y.2d 887, 888; Matter of Lincoln v Lincoln, 24 N.Y.2d 270, 273). As we further stated in Matter of Nehra v Uhlar (43 N.Y.2d 242), "The desires of young children, capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent, do not always reflect the long-term best interest of the children" (id., at 249; see also, Elkins v Vanden Bosch, 433 So 2d 1251, 1252 [Fla 3d Dist Ct App], review dismissed 438 So 2d 831 [Fla 1983]). Such cautions are particularly relevant here where the record demonstrates the father's antipathy towards his ex-wife.